# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GORDON COFFEY, | 1:09-CV-01220 AWI SMS HC |
| Petitioner, | FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS |
| v. | |
| KEN CLARK, Warden, | |
| Respondent. | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

**PROCEDURAL BACKGROUND**

Petitioner is currently in the custody of the California Department of Corrections serving an indeterminate sentence of fifteen years to life for his 1996 conviction for second degree murder. See Petition at 2.

On June 4, 2007, a parole suitability hearing was held before the California Board of Parole Hearings ("Board") to determine Petitioner's eligibility for parole. (HT[1] at 1.) Petitioner attended the hearing and was represented by an attorney. (HT at 1-2.) At the conclusion of the

---

[1]"HT" refers to the hearing transcript that is attached to Exhibit 3 to Respondent's Answer.

1

hearing, the Board denied parole and deferred rehearing for four years. (HT at 72.)

On April 5, 2008, Petitioner filed a petition for writ of habeas corpus in the San Bernardino County Superior Court. See Answer, Exhibit 1. On April 30, 2008, the petition was denied for Petitioner's failure to supply an adequate record. See Answer, Exhibit 2. On July 7, 2008, Petitioner filed a supplemental petition in the San Bernardino County Superior Court. See Answer, Exhibit 3. The petition was denied on July 14, 2008, in a reasoned decision. See Answer, Exhibit 4. On September 26, 2008, Petitioner filed a habeas petition in the California Court of Appeals, Fourth Appellate District. See Answer, Exhibit 5. The petition was summarily denied on October 7, 2008. See Answer, Exhibit 6. On November 7, 2008, Petitioner filed a petition for writ of habeas corpus in the California Supreme Court. See Answer, Exhibit 7. On May 13, 2009, the petition was denied. See Answer, Exhibit 8.

On July 14, 2009, Petitioner filed the instant federal petition for writ of habeas corpus. The petition challenges the 2007 decision of the Board of Parole Hearings denying parole. Petitioner contends the Board of Parole Hearings violated his due process rights in denying him parole. He argues the decision offers no reason why Petitioner's offense makes him a current risk of danger to public safety. On September 29, 2009, Respondent filed an answer to the petition. Petitioner filed a traverse to Respondent's answer on October 9, 2009.

## FACTUAL BACKGROUND[2]

On December 29, 1994, the victim's body was discovered buried in a shallow grave near a transient campsite known as "the hole." "The hole" was located near the dry wash in the Mojave River in San Bernardino, north of the 1500 block of Riverside Drive, within walking distance of the nearby McDonald's, the Interstate 15 over-crossing of the railroad tracks, and Sturnacle Park. The prosecution presented evidence showing that five people were at the campsite when the victim, Brandolino, was murdered. The defendants included Petitioner, Jack Raines ("Jack"), Richard Campbell ("Campbell"), Mike Hampton ("Hampton"), and Kathren Kelly ("Kelly"). Campbell was a homeless person who shared the camp on the night of the

---

[2] The information is derived from the factual summary as set forth in the parole hearing proceedings. (HT 10-19.)

2

murder and witnessed most of the beating. Kelly was Hampton's fiancée, who also witnessed most of the beating. Although Campbell and Kelly were granted immunity at trial, their testimony was often inconsistent with statements they made at the preliminary hearing and with statements they made to police during the criminal investigation.

In late November or early December of 1994, Campbell met Brandolino in the area behind the McDonald's restaurant outside Barstow. After Campbell met Brandolino, Campbell stayed with Hampton and Kelly at the "hole" for a few nights. While staying there, Campbell also met Petitioner, who he knew as "Russell," and Jack. The day before the murder, Campbell and Brandolino were walking and talking in an empty lot near the McDonald's restaurant when Jack appeared. Jack noted that Brandolino had two tattoos representing membership in the Aryan Brotherhood. Jack had similar tattoos and apparently thought Brandolino unworthy of donning the marks. Jack began a verbal assault. Jack left and later returned with Hampton. Backed by Hampton, Jack continued his verbal assault of Brandolino. Hampton commented to Campbell that he "might not want to see this close, close" or words to that effect. Jack verbally abused Brandolino and then struck him two or three times in the temple with his fist. Brandolino remained passive and "just took whatever Jack was dishing out." Jack yelled at Brandolino and took his backpack and radio. After the robbery, Jack and Hampton invited Campbell to "the hole" for dinner.

Early in the evening of the next day, Jack and Petitioner walked into the campsite with Brandolino. Brandolino went into the campsite because Jack promised to return the stolen backpack and radio. Campbell, Kelly, and Hampton were present. The men began drinking beer and vodka. Shortly thereafter they began to argue. Jack repeated his verbal assault on Brandolino regarding his tattoos. Brandolino remained passive. Jack and Petitioner began hitting Brandolino and knocking him to the ground. Kelly and Campbell testified at trial that Jack and Petitioner were consistently and violently assaulting Brandolino. They testified that Hampton did not hit Brandolino until he made two derogatory remarks; one about a "dirty redskin," which derided Hampton's Indian heritage, and another calling his fiancée (Kelly) a "bitch." However, in Kelly's videotaped interview she repeatedly stated that all three men, Jack, Petitioner and Hampton, were

3

the assailants who violently beat Brandolino throughout the assault.

During the first hour, the assailants stopped periodically to rest; however, they would keep Brandolino trapped until they were ready to resume the beating. After a half hour into the assault, Brandolino was told he could leave. He walked 20 to 30 yards out of the campsite, turned around and said something about going to the police. Hampton told Petitioner and Jack to get Brandolino and bring him back to the camp. They did. Jack and Petitioner tied Brandolino's hands and feet with a rope. Brandolino was left alone for a while and then the beating resumed for another 10 to 45 minutes. By the time Brandolino was untied, he was very hurt. He was slumped over. Jack poured water on him and told him it was gasoline. Brandolino yelled out "oh no" or "please don't do that" or something to that effect. Brandolino was hit a few more times and then taken out of the campsite. While dragging Brandolino away, Jack said something about putting him in the train or putting him on the train or putting him on the tracks.

Initially, Campbell, Kelly, and Hampton remained at the campsite. However, shortly thereafter Hampton left in the direction that Jack and Petitioner had taken Brandolino. Minutes later, Kelly followed. When she reached the other side of the bushes, she observed Petitioner, Jack, Hampton, and Brandolino. Brandolino was lying on the ground. Petitioner was sitting on his chest or stomach. Jack was sitting on his feet and Hampton was squatting on the ground close to his head. When the assailants saw Kelly, they ordered her to go away. Kelly left and walked back to the campsite, where Campbell had remained.

After a few minutes, Hampton returned to the campsite and said Brandolino was dead. Jack and Petitioner returned to the campsite and then left to go wash the blood from themselves. Later Jack said something to the effect that "it was done now." Hampton left the campsite but returned within five minutes and stated to Jack "if you've done this, you need to bury him." Jack took a shovel and buried Brandolino with Petitioner's assistance.

After burying Brandolino, Jack and Petitioner left. Petitioner went to a nearby apartment, which he shared with his wife and a man named Joe King. King saw Petitioner come home with mud on his clothes. He also heard Petitioner confess that he had "helped kill somebody."

The next morning, Campbell, Kelly and Hampton gathered up the clothes around the

campsite and burned them. A few days later the three hopped a train to Las Vegas.

On January 5, 1995, a pathologist performed an autopsy on Brandolino's body and determined the time of death to be sometime between December 14 and December 29, 1994. He opined that the cause of death was multiple blunt force injuries. Brandolino suffered damage inside his skull near the brain and excessive bleeding above the skull, down to the bone. He also suffered a fractured thyroid cartilage (Adam's apple), 14 fractured ribs, a tear to his liver, and numerous contusions about the head, torso, penis, and extremities. The body, which was exhumed from a shallow grave, showed pit marks from rocks, scrapes from being dragged and extensive abrasions from nearby brush.

According to Petitioner, he met Brandolino for the first time on the day of the murder at "the hole." A fight began and he was intimidated into hitting Brandolino by Jack and Hampton. He confessed to hitting Brandolino four times with play punches. He denied kicking or murdering him. Petitioner testified that he left "the hole" long before Brandolino was hurt and implied that Brandolino's fatal injuries were inflicted afterwards. Petitioner also said that although he spent roughly 45 minutes at "the hole" he had no memory of seeing Campbell there. Petitioner presented the testimony of an investigator and a lay witness who were called to discredit Joe King. Petitioner also offered, for impeachment purposes, at tape of a police interview with Kelly. Hampton did not testify and presented no evidence at trial. On rebuttal, the prosecution offered evidence confirming that Petitioner had lied to the police, and showing that Campbell's preliminary hearing testimony was in some respects more damning than his trial.

On November 20, 1995, the jury found the defendants guilty of second degree murder.

**DISCUSSION**

I.   Standard of Review

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy,

5

521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

Petitioner is in custody of the California Department of Corrections pursuant to a state court judgment. Even though Petitioner is not challenging the underlying state court conviction, 28 U.S.C. § 2254 remains the exclusive vehicle for his habeas petition because he meets the threshold requirement of being in custody pursuant to a state court judgment. Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-1127 (9th Cir.2006), *citing* White v. Lambert, 370 F.3d 1002, 1006 (9th Cir.2004) ("Section 2254 'is the exclusive vehicle for a habeas petition by a state prisoner in custody pursuant to a state court judgment, even when the petition is not challenging his underlying state court conviction.'").

The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death Penalty Act which became effective on April 24, 1996. Lockyer v. Andrade, 538 U.S. 63, 70 (2003). Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); see Lockyer, 538 U.S. at 70-71; see Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71, *quoting* 28 U.S.C. § 2254(d)(1). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id.

Finally, this Court must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at

6

72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

"[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. See Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir.2003); Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

AEDPA requires that we give considerable deference to state court decisions. The state court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). We are bound by a state's interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir.2002), *cert. denied*, 537 U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

In this case, because the California Supreme Court summarily denied the habeas petition, this Court must "look through" that decision to the decisions below. Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n.3 (1991).

1 II.     Review of Petition

2          A parole release determination is not subject to all the due process protections of an
3 adversary proceeding. Pedro v. Oregon Parole Board, 825 F.2d 1396, 1398-99 (9th Cir. 1987); see
4 also Greenholtz, 442 U.S. at 12 (explaining that due process is flexible and calls for procedural
5 protections that particular situations demand). "[S]ince the setting of a minimum term is not part
6 of a criminal prosecution, the full panoply of rights due a defendant in such a proceeding is not
7 constitutionally mandated, even when a protected liberty interest exists." Pedro, 825 F.2d at
8 1399; Jancsek v. Oregon Bd. of Parole, 833 F.2d 1389, 1390 (9th Cir.1987). At a state parole
9 board proceeding, the only procedural process to which an inmate is entitled is: 1) the inmate
10 must receive advance written notice of a hearing, Pedro, 825 F.2d at 1399; 2) the inmate must be
11 afforded an "opportunity to be heard," Greenholtz, 442 U.S. at 16; and 3) if the inmate is denied
12 parole, the inmate must be told why "he falls short of qualifying for parole." Id.

13         As to these procedural protections, Petitioner was provided with all that is required. He
14 was given advanced written notice of the hearing, an opportunity to submit materials for the
15 Board's consideration, an opportunity to be heard, representation by an attorney, and a written
16 decision explaining the reasons parole was denied.

17         "In Superintendent v. Hill, the Supreme Court held that 'revocation of good time does not
18 comport with 'the minimum requirements of procedural due process,' unless the findings of the
19 prison disciplinary board are supported by *some evidence* in the record.' 472 U.S. 445, 454
20 (1985), *quoting* Wolff v. McDonnell, 418 U.S. 539, 558 (1974)." Sass v. California Board of
21 Prison Terms, 461 F.3d 1123, 1128 (9th Cir.2006) (italics added); Irons v. Carey, 505 F.3d 846,
22 851 (9th Cir.2007), *quoting* Hill, 472 U.S. at 457 ("We have held that 'the Supreme Court ha[s]
23 clearly established that a parole board's decision deprives a prisoner of due process with respect
24 to this interest if the board's decision is not supported by 'some evidence in the record,' or is
25 'otherwise arbitrary.'"). In assessing "whether a state parole board's suitability determination
26 was supported by 'some evidence' in a habeas case, our analysis is framed by the statutes and
27 regulations governing parole suitability determinations in the relevant state." Irons, 505 F.3d at
28 851. Here, the Court must look to California law and review the record. In reviewing the record

and determining whether the "some evidence" standard is met, the Court need not examine the entire record, independently assess the credibility of witnesses, or re-weigh the evidence. <u>Sass</u>, 461 F.3d at 1128.

Further, the California Supreme Court more recently stated:

> "[T]he relevant inquiry is whether the circumstances of the commitment offense, when considered in light of other facts in the record, are such that they continue to be predictive of current dangerousness many years after the commission of the offense. This inquiry is, by necessity and by statutory mandate, an individualized one, and cannot be undertaken simply by examining the circumstances of the crime in isolation, without consideration of the passage of time or the attendant changes in the inmate's psychological or mental attitude.

<u>In re Lawrence</u>, 44 Cal.4th 1181, 1221 (2008). The nature of the commitment offense "does not in and of itself provide some evidence of current dangerousness to the public unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety." <u>Id</u>. at 1214.

In denying parole in this case, the Board based its decision on the following factors: 1) The nature and gravity of the commitment offense; 2) Previous criminal record relating to substance abuse; 3) Failure to sufficiently participate in self-help programming, especially in the area of substance abuse; 4) Institutional behavior; 5) Psychological report; and 6) Lack of viable parole plans. (HT at 63-72.)

First, the Board determined that Petitioner committed the offense in an especially heinous, atrocious or cruel manner.[3] The Board first found that the offense was carried out in a

---

[3] Pursuant to Title 15, of the California Code of Regulations, Section 2402(c) sets forth circumstances tending to demonstrate unsuitability for parole when the prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:
   (A) Multiple victims were attacked, injured or killed in the same or separate incidents.
   (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.
   (C) The victim was abused, defiled or mutilated during or after the offense.
   (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.
   (E) The motive for the crime is inexplicable or very trivial in relation to the offense.

15 Cal.Code Regs. § 2402(c)(1)(A)-(E).

9

1  calculated and dispassionate manner pursuant to § 2402(c)(1)(B). The superior court determined
2  that sufficient evidence supported this finding given that the victim was beaten to death. <u>See</u>
3  Answer, Exhibit 4. The record reveals that Petitioner participated in a lengthy beating of the
4  victim. The victim was bound and did not resist. Petitioner with the other assailants repeatedly
5  beat the victim, taking a break at some points before resuming the beating. Eventually, the victim
6  succumbed to his wounds which included skull injuries, rib fractures, thyroid fracture, multiple
7  contusions about the body, a tear to the liver, and brain damage. Certainly, there is at least some
8  evidence supporting the finding.  The Board also found that the offense was carried out in a
9  manner which demonstrates a callous disregard for human suffering pursuant to § 2402(c)(1)(D).
10 This factor was also well-supported given the above-noted facts. The Board further determined
11 that the motive was inexplicable in relation to the offense pursuant to § 2402(c)(1)(E). The
12 record also supported this finding, since the victim did not fight back and Petitioner had not met
13 the victim until the day before, yet he helped beat the victim to death for no apparent reason.
14 Finally, the Board found that the victim's body was abused or defiled during and after the offense
15 pursuant to § 2402(c)(1)(C). The evidence also substantiates this finding. The victim sustained a
16 tremendous beating which resulted countless injuries, fractures, and ultimately led to the victim's
17 death. In addition, there was evidence of pock marks, scrapes, and abrasions of the skin from the
18 victim's body being dragged through rocks and brush and being buried in a shallow grave. In
19 light of the facts of the offense, the superior court's determination that some evidence supported
20 the Board's finding that the offense was especially heinous, atrocious or cruel as to be a
21 sufficient basis to deny parole was not unreasonable.
22       The Board next found Petitioner's prior offenses, especially those concerning substance
23 abuse, to be indicators of unsuitability. 15 Cal. Code Regs. § 2402(c)(2). By Petitioner's own
24 admission, he sustained five previous convictions for driving under the influence. He also
25 suffered a conviction for destroying property. Despite society's previous attempts to correct his
26 criminality, which included parole, probation, jail time, and a prison term, Petitioner persisted in
27 criminal activity. Moreover, Petitioner himself attributes his participation in the underlying crime
28 to his alcohol abuse.

The Board further found Petitioner failed to participate sufficiently in self-help programming, particularly in the area of substance abuse. While this is not a specific circumstance indicating unsuitability, it can be considered as relevant evidence in determining suitability. 15 Cal. Code Regs. § 2402(b). Petitioner admitted to having a drinking problem which started in his teen years. He suffered multiple convictions for driving under the influence. He attributed his participation in the crime to his alcohol abuse. Nevertheless, he had never completed an Alcoholics Anonymous or Narcotics Anonymous program. (HT at 31-32.) He failed to participate in any such programming in prison, and he admitted he had done "nothing" to ensure that drinking would no longer be a problem for him if released. (HT at 36, 50.) When asked why he hadn't, he stated he had no legitimate reason for not participating. (HT at 51.) As stated by the superior court, Petitioner "has stubbornly refused to participate in alcohol abuse training . . . . Such conduct is a refusal to rehabilitate and is strong evidence that petitioner will revert to his dangerous lifestyle when released." See Answer, Exhibit 4.  Given the facts, the Board's determination that Petitioner would pose a risk to public safety if released is understandable, and the state court's finding of some evidence was clearly reasonable.

Next, the Board determined that Petitioner's misconduct during incarceration indicated he remained a current risk of danger to the community.  15 Cal. Code Regs. § 2402(c)(6). The Board noted that Petitioner had received two counseling chronos ("CDC 128") during his incarceration. (HT at 64.) Further, in January of 2003, he sustained a serious rules violation ("CDC 115") for disobeying a direct order. (HT at 64.) Thus, there is at least some evidence supporting this finding.

The Board also considered the psychological report pursuant to 15 Cal. Code Regs. § 2402(c)(5). The report was deemed not supportive of release because it concluded Petitioner posed an above average risk of committing violence if released, especially if he could not maintain his sobriety. (HT at 46-47, 65.) The psychologist also noted that Petitioner exhibited no signs of remorse. Further, Petitioner failed to take any responsibility for the actual killing. The state court stated that rehabilitation was impossible under these facts. See Answer, Exhibit 4. The state court finding on this issue was also not unreasonable.

Finally, the Board noted that Petitioner had no viable parole plans. He did not have employment plans and he did not have viable residential plans.

The Board also considered the positive factors favoring parole release. The Board commended Petitioner for having obtained his GED. (HT at 67.) The Board also considered his participation in VOC welding and noted that this was a marketable skill. Petitioner was also complimented on his participation in self-help programming in anger management, parenting, and breaking barriers. (HT at 67.)  Nevertheless, the Board concluded Petitioner remained an unreasonable risk of danger to the public in light of his crime, his past criminal behavior involving substance abuse, his misconduct in prison, his failure to participate in self-help programming in the area of substance abuse, psychological factors, and his lack of viable parole plans. The state court finding that some evidence supported this determination was not unreasonable.

In light of the above, it cannot be said that the state court resolution of Petitioner's claims "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d).

## RECOMMENDATION

Based on the foregoing, it is HEREBY RECOMMENDED that:

1. The petition for writ of habeas corpus be DENIED; and
2. Judgment be entered in favor of Respondent.

This Findings and Recommendations is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Replies to the objections shall be served and filed within ten (10) court days (plus three days if served by mail) after service of the

1  objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. §
2  636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time
3  may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th
4  Cir. 1991).

6  IT IS SO ORDERED.

7  **Dated:   November 10, 2009**             /s/ Sandra M. Snyder
                                              UNITED STATES MAGISTRATE JUDGE